A.D. 6th, 2015 At 2302 – Krishna Grubbs et al. firm's lich seeke Sheakley Group Inc. et al, the first financial entity mentioned in li issue. Guardian departments or the threwn due 15 minutes or 5, many I believe have decided they'll go materially new until their findings come from us. A.D. 6th, 2015 At 2302 – Krishna Grubbs et al. firm's lich seeke Thank you. May it please the court. My name is Robert Winner. I represent Appellants Linda Grubbs, Tri-State Limited, Tri-State No. 1 LLC and Capital Concepts, Inc. I've reserved 4 minutes for rebuttal, if that's okay, Judge Kline? Yes. Thank you, sir. This is appeal from the trial court's grant of motions to dismiss for failure to state a claim based upon plaintiff's assertion of claims under the Lanham Act for false designation of source and false advertising and also under the RICO statute for racketeering and conspiracy to commit that. The state law, those federal claims were dismissed with prejudice. The state law claims were under the supplemental jurisdictional statute were dismissed without prejudice. Judges, these claims arise, have a lengthy history, but most of the facts we'll hear about today started in approximately February of 2009 and continued for 8 months as a result of that 8-month period, the clients' cash and other property of Capital Concept and Tri-Serve were taken by these defendants and transferred to one or more of the Shakeley Entity defendants. And that was done by way of Defendant Angela Strunk-Zwick and conjunction with many activities and employees and agents of the Shakeley Entity defendants. Along the way, judges, the false designation under the Lanham Act was violated, the false advertising statute under the Lanham Act was violated and also RICO was. This matter was submitted to the magistrate judge who promulgated a detailed report and it was adopted by the federal district court judge. The issue that we did not prevail on as plaintiffs below was the likelihood of confusion. That's the essence of a false designation of origin claim. The issue turns on is the public likely to be confused by defendant's product or services for that of plaintiff. And as I've indicated, the primary thrust of this false designation came on or about July 2nd and July 3rd of 2009. At that time, emails were sent by the Shakeley Entity's agent at the time, Ms. Strunk-Zwick, to all of Tri-State clients. You can find that at Exhibit 135. And it indicated a number of things. It said Tri-Serve is moving. Tri-Serve is partnering with Shakeley HR. Tri-Serve has been accustomed to before this move. Nothing will change. And the future contact information includes Tri-Service LLC, or limited, excuse me. The emails couched in the terms of the word we, but the plaintiffs pled that we means Tri-Serve. It doesn't mean these individual plaintiffs. And why is that? Because Tri-Serve is what's known as a professional employer organization under Ohio law. And what that means is that professional employer organizations provide workers' comp, tax, payroll, and other services. It's a regulated entity by the Bureau of Workers' Claims. You're saying that's a violation of the Lanham Act, their use of the... No, no, no. That goes towards it. That goes to confusion in the public, because the public necessarily is concerned with the government entity that regulates the PEO, which is the Department of Workers' Claims. We have confusion at two spots. Tri-Serve's existing customers, who's going to be providing the service, because Tri-Serve has written PEO contracts with its clients. And now we have some employee of the Shakley defendant saying, no, something else is going down here. There may also be prospective clients of Tri-Serve that are confused. But what also is confusing is professional employer organizations. They're part of the public, too. So who's providing the services? And that's where the confusion is at here, Your Honor. What's the cause of action for this that you've related to us? Is it a Lanham Act violation or a RICO or a state law violation? Right now, I'm... Excuse me, Your Honor. Right now, I'm talking and discussing the false designation of origin, cause of action under the Lanham Act. Okay. Now, I'm creating the confusion. Sorry. That's what I thought you were on, but I thought you said, no, you weren't on that. That's not correct. And you are on that. Yes. Okay. Yes. I'm at that point. There are two RICO claims... Excuse me, two Lanham Act claims, and I'm on the false designation. I think I've cited in the opening brief that revised code 4125.04 provides the... The Tri-Serve is an employer, a professional employer organization, and it's governed by these agreements. And it provides these PEO services to its clients under pursuance of the Bureau of Workers' Compensation. So the point being is that Shakely needed to continue using Tri-Serve's mark until such time as it is able to shift all these PEO agreements from Tri-Serve over to whatever entity that they choose in their corporate organization. And that's why Tri-Serve is used in correspondence to clients, because Tri-Serve is necessary, at least for some period in the future. And this is the use of the mark or the trademark that's causing the confusion. The next thing I'd like to discuss, if I may, if I can move on from false designation is to the false advertising, which is Section 1125A1 and B of the Lanham Act. We have shown or pled that the Shakely defendants made false, deceptive, and misleading statements, representations of fact. I've briefly mentioned to you at their Exhibit 135, Tri-Serve's moving, they're partnering. The need for partnering is due to tremendous growth, need more space and more resources. And again, the origin of the PEO services are to be provided by Tri-Serve. I'm sorry. So the advertising that's being complained of is this email to clients by this individual, though the double last name, at a time when she's not yet affiliated with Shakely, and the misrepresentations relate, among other things, to a future affiliation between Tri-Serve and Shakely, which our defendant, who's not before the court, had no authorization to do, and which, in fact, was in breach of her covenant not to compete. Partially, but in many points, no. I understand that Shakely isn't really claiming in the context of this motion that it didn't advertise, that it was not the advertising entity. I'm just trying to make clear who was doing what at what point in time. Plaintiffs' appellants contend that by early July, Ms. Strunk-Zwick was an employee or agent of... Not at the time of the email you've been referring to, though. I believe that we've pledged that she was. When she left the office, she displayed everything... Is this not the same email that says, next week we will be affiliated? I don't recall. I recall the pleasant tense, not the past, and not only that, but she also followed up with hard copy. Monday, my phone number will be... Is this a different email? Yeah, that's it. Part of the Lanham Act claim is we only had 23 clients that were listed on the two block of the emails and in the hard copies. But in the emails, the partnering is being admitted to, and the business is growing. So, Ms. Strunk-Zwick then destroyed our ability to track down the market share because there was nothing left when we came into work the next day. I didn't get to talk about RICO, but I see my time is up. Thank you for your time. Thank you. Good morning, Your Honors. I'm Rachel Rowe, and I represent, excuse me, the Shakely entities and the individuals employed by Shakely, who have been referred to as the Shakely defendants. Your Honors, this case is about a plaintiff's companies recasting the facts, mischaracterizing the applicable case law, and asserting arguments for the first time on appeal that never were asserted below and that weren't considered by the magistrate judge. Saying that, I want to turn directly to the merits of the arguments, and I will try to be sustained. Let's first talk about the Lanham Act Trademark Infringement Claim. The Lanham Act Trademark Infringement Claim focuses on the potential for confusion among the public. Judge Gibbons, as you pointed out, the claim is based entirely on an email that was sent by Ms. Strunk-Zwick to customers of TriServe, 23 of them, shortly before she joined the Shakely entities as an employee. It was, again, re-sent by Ms. Strunk-Zwick by regular mail after she joined the Shakely entities. What the district court held, and what you should affirm, is that under the Hensley case that was decided by this circuit court, those communications were nothing more than an explanation to clients with whom Ms. Strunk-Zwick had worked for a number of years that she was, in fact, moving from the employment of TriServe to the employment of Shakely HR. The mark of TriServe was used in those letters to compare the services of TriServe with Shakely. Well, but she also represents that TriServe is her entity that she's free to move. Well, she doesn't say, I am leaving the employment of TriServe and I will be going to work for Shakely. I hope I will have the opportunity to serve you in this new capacity. I mean, the whole thrust of the representation is that TriServe is hers to move, and that she is, in fact, moving this entire entity to a new entity, so theoretically they can serve their existing customer base better. There's no effort to separate herself from TriServe. Isn't that fair? I actually don't think that's fair. I think there's quite an effort for her to separate herself. She uses the Shakely HR mark throughout the email many, many times. She says, we, referencing herself and two clerical employees, are moving to Shakely HR. She gives her future contact information, both email address and physical address, at one Shakely Way at Shakely HR. But even if we accept it as true, what you're saying, that some confusion could be inferred, the fact of the matter is that under the eight-factor test that was announced by this Court in Daddy's Junkie, there is no evidence of a likelihood of confusion here. And I'll note, interestingly, that plaintiffs urged the Court to rely on the Quicken Loans case to make that assessment here. But if you do look at the Quicken Loans case and make the conclusion that Strunk-Swick's use of the TriServe mark wasn't in an exclusively non-trademark way, and we dispute that, but if you go there and apply the Quicken Loans case, you'll see that the district court's dismissal of this claim still should be affirmed. In Quicken Loans, the Court focused on the fourth factor of the eight-factor test, and that's evidence of actual confusion. In Quicken Loans, the Court found that plaintiff had adequately pled evidence of actual confusion because they pled 75 instances of actual confusion based on transcripts of calls from Quicken Loan customers to Quicken Loan, the company, wanting to know if the letter in question in that case was sent by Quicken Loan. Here, you have zero instances pled of evidence of actual confusion. In their two complaint paragraphs, which cite two emails that allegedly were forwarded from TriServe customers to people at TriServe, but there's no evidence that there was confusion by those two customers. And in fact, in the Quicken Loans case, this Court says, hey, look, if you have a relatively small number of evidences of actual confusion, that may be enough to infer that there is no likelihood of confusion. So in Quicken Loans, on the one hand, you have 75 instances of actual confusion. Here, you have zero. Under those circumstances, under any reading of the applicable case law, the district court's dismissal of the trademark infringement claim should be affirmed. And in fact, the district court's application of the Hensley case to the case here was correct and it should be affirmed. Well, you know, in this particular case, I mean, this is a, we're in the context of a motion to dismiss. And the pleading, I mean, certainly, ultimately, actual confusion would probably be a very important factor. But it would seem to me that the content of the email coupled with the confusion would provide sufficient evidence to survive a motion to dismiss, particularly given the inferences I suggest could be drawn from the email about her taking the company with her and that its clients would, in the future, be serviced by Shakely. I mean, I would look at that. And I think one could argue that those facts as pled show a high likelihood of actual confusion. I respectfully disagree, Your Honor. I think if you read the words of the email, she may... I've read them about ten times and you and I, I think, just disagree on the fair inferences to be drawn from it. I think that's right, Your Honor. But I would say again, if you look at the Hensley case, which I believe is close factually to this one, and even if you apply the Quicken case, which plaintiffs are, I would suggest to you that the district court's ruling should be affirmed. Of course, at this point, we are applying a pleading standard. That's right. And it's true, obviously, that... I mean, and the test we're looking at is one that deals with, ultimately, whether the plaintiff has actually established a claim, one that would be more appropriate for application in a summary judgment context. That's right, but you have to consider whether the facts pled here are sufficient to state a claim under the very narrow constructs of federal laws and the federal Lanham Act trademark enforcement. I don't think... I don't need to be lectured on that. I got that. Yeah, I don't mean to lecture you, but this is a serious case for our clients, and the allegations, we're talking about a 157 page complaint with more than 1,000 paragraphs of allegations, most of them conclusory claims that really have no support in fact, and the district court judge dismissed the state law claims without prejudice. These defendants will have their day in court. I don't endorse this style of pleading. Thank you. Did I adequately address your question, Your Honor? Yeah, I think so. Thank you. Next, I'd like to move briefly to the false advertising claim, and with respect to the false advertising claim, the district court held that it's a pleading requirement that the plaintiffs plead facts related to the size of the relevant market. The district court relied on the infection protection case, which basically talks about this court's lidocaine case, and really the question for the court here is, are facts pled that would be sufficient to establish that the statements made are indeed commercial advertising, and that the relevant market has been penetrated. The district court appropriately held under the infection protection case, Your Honors, that there were no such facts pled. Now, again, the plaintiffs have raised on appeal arguments that they did not raise below, and under this court's case, in the Muir opinion, which was authored by Judge Clay, the plaintiffs have waived those arguments because they didn't raise them below. The district court didn't have an opportunity to consider them in accepting the arguments raised for the first time here. Again, it's important to note that there are no facts about the size of the relevant market. The infection protection case was dramatically mischaracterized by plaintiffs in their briefs, who claimed that the magistrate judge's ruling in that case was overturned by the district court when it modified the size of the relevant market were required, was not overturned in any way. And obviously, you can't determine market penetration unless you know the size of the market. So again, plaintiff mischaracterizes the ruling of the infection protection district judge. The ruling of the district court should be affirmed. Plaintiff has pled zero facts about the size of the relevant market. And it's the relevant market size, you have to plead facts about the size of the number of the customers in the industry. It doesn't suffice simply to say that all of plaintiff's customers were sent a communication. The issue is, was the relevant market penetrated? And there is material... Well, do we know? I mean, do we know anything about TriServe's customer base? Well, we do know something about the relevant market, because Exhibit 6, the plaintiff's complaint, which attached a publicly available finding about the Shagley companies, talks about the Ohio PEO industry. No, no, that's not what I'm asking you. I understand you contend that the relevant market is something other than the TriServe base. I'm just saying, if the more relevant market is how many customers TriServe had, and we know this particular communication was sent to 23 customers, do we know, for example, what percentage of TriServe's client base this email reached? We don't know for certain, but we do know that it was a substantial part of TriServe's customers. Is that from the... Is that from the complaint? It is, because in December of 2009, when the Shagley entities offered to give the customers back to the plaintiff, the plaintiff said, We don't have any business anymore. We can't even service these customers. It essentially was their entire business, those 23 customers. Again, though, that's not relevant to... Excuse me. It's not relevant to the issue whether the commercial advertising prong of the false advertising claim is met, because there, the case law is clear. The relevant market is the industry as a whole, and as I was referencing, we know that Shagley has over 11,000 customers in the industry. We know that Shagley is not the only player, so you're talking about a market that's at least 11,000 customers strong. And clearly, under all the applicable case law, Lidochem, from this circuit and the infection protection case and all the cases cited therein, that does not constitute sufficient allegations about market penetration. Is market penetration explicitly a part of the law in this circuit? Well, yes, because the Lidochem case talks about commercial advertising, and it has to be sent to... Yes, it is. In the Lidochem case, it's clearly talked about. They don't use the term market penetration, but absolutely it is. So I guess there's some question about how robust that requirement is in this circuit, arguably. I don't believe so, Judge Gibbons. I mean, in Lidochem, this circuit said, in order to fulfill the commercial advertising or promotion prong, plaintiff must allege statements that were disseminated to the relevant purchasing public. I see I only have a few minutes left. Can I... You're not required to use the entire time. I'm sorry. No, a few seconds left. I would like to talk briefly about the RICO claim and just say that, of all the claims asserted by plaintiffs, this, I believe, is the biggest stretch. There are no facts pled to suggest a threat of ongoing criminal activity here, none at all. The cases cited by plaintiffs in the briefs on appeal are inapplicable, even under the Busaca case. There literally are no facts that would support the suggestion of a threat of ongoing criminal activity. I see my time is up. Do you have any more questions, Your Honors? Apparently not. Thank you. Judges, with regard to the Hensley case, in the context of Lanham Act, there are five ways that that case can be distinguished from the case at Barr. First, in Hensley, they did not actually use Mr. Hensley's name. Here, they used TRISERV's name, and they had to, to satisfy regulatory requirements. Second, notwithstanding my counsel's or my colleague's inability to find confusion, it was pled and it was mentioned in our brief. My recollection is H&H comes to mind. And certainly, dealing with the administrative process, if we're using Shakely defendant customers with a TRISERV PEO agreement, there's confusion. And defendants, as we've indicated, flat out said that TRISERV has partnered with Shakely, when in fact, TRISERV has not. Those are clear distinguishing points. Quicken Loans, I think, is a much closer case to what we have here. True, 75 folks were contacted, but we only had 23 here, and that's because their agent, employee, whatever she was, on July of, second and third of 2009, the recent wiping of servers isn't the first time that happened. It happened in July of 2009. We know of 23. We need to know more. As far as the size of the relevant market, we know there's 23. Again, you just can't take 23 and then, by the nifty trick of wiping out a server, say, that's the market. That's all we know. That's all we can plead. And that's all I have, Your Honor. Well, your clients would have the ability to plead their customer base, even if they didn't have the ability now to know its exact size, because they don't have the computer information. But surely some representative of your company would know basically how many customers this company was servicing. We know of 23 or so. So say you couldn't plead is... That's what we know. Okay. And I don't wanna expand it beyond what we know. Based on what's in our briefs... Oh, by the way, Hensley is distinguishing points from page 20 of the reply brief. We would ask that the court reverse the orders dismissing the case and remand it for further proceedings, and that they allow the state court to exercise supplemental jurisdiction over the state court claims. Any questions? I have a minute. No, no further questions. Thank you, Judge. Thank you, Your Honor. Thank you. And the case is submitted.